NATIONAL COALITION FOR
MARINE CONSERVATION,
et al., Plaintiffs

v.

Donald L. EVANS, et al., Defendants,

and

Blue Water Fishermen's Association,
Intervenor–Defendants

The Billfish Foundation,
et al., Plaintiffs,

v.

Donald L. Evans, et al., Defendants,

and

Blue Water Fishermen's Association,
Intervenor–Defendants

A Fisherman's Best, Inc.,
et al. Plaintiffs,

v.

Donald L. Evans, Defendant,

and

National Coalition For Marine
Conservation, et al., Inter-
venor–Defendants

Nos. CIV.A.99–1692(RWR), CIV.A.00–
2086(RWR), CIV.A.00–
3096(RWR).

United States District Court,
District of Columbia.

Oct. 31, 2002.

Monica Burke Goldberg, Washington, DC, for Plaintiffs.

Alison V. Areias, U.S. Department of Justice Department of Commerce Environmental Division, Washington, DC, Samuel D. Rauch, II, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, David W. Hoskins, Alison V. Areias, U.S. Department of Justice Environmental Division, Washington, DC, for Defendants.

### MEMORANDUM OPINION

ROBERTS, District Judge.

Plaintiffs in these consolidated cases are non-profit and other organizations involved in marine conservation, or recreational or commercial pelagic longline fishing, that bring divergent challenges to certain of the Commerce Secretary's [1] regulations implementing the final 1999 Highly Migratory Species Fishery Management Plan. Plaintiffs National Coalition for Marine Conservation ("National Coalition"), The Billfish Foundation and A Fisherman's Best, and the federal defendants, each have filed cross-motions for summary judgment.[2] Because the Secretary acted within his authority as to the challenged regulations, the federal defendants' motion for summary judgment will be granted and the plaintiffs' motions for summary judgment will be denied.

## I. INTRODUCTION

Highly Migratory Species ("HMS") include species such as billfish (a term which

---

1. Donald L. Evans was confirmed as the new Secretary of Commerce and is substituted pursuant to Fed.R.Civ.P. 25(d)(1) as the named defendant in place of Norman Mineta.

2. The National Coalition and the National Audubon Society (collectively, "Environmental Intervenors"), who are plaintiffs in Civil Action No. 99–1692, have intervened in support of granting summary judgment in defendants' favor only as against plaintiffs in Civil Action No. 00–3096. The Blue Water Fishermen's Association, Inc., also has intervened, moving for summary judgment on its own behalf and opposing summary judgment for plaintiffs in Civil Action No. 99–1692 and in Civil Action No. 00–2086. The Blue Water Fishermen's Association takes no position on A Fisherman's Best's motion for summary judgment in Civil Action No. 00–3096. This Memorandum Opinion addresses the arguments and relief sought in both motions for summary judgment filed by the intervenors. Accordingly, intervenors' motions will be denied as moot.

includes blue marlin and white marlin), tuna, sharks and swordfish.[3] Pelagic longline fishers catch HMS with forty-mile long fishing lines set up in certain ocean depths in the Atlantic Ocean. *See* Administrative Record ("A.R.") Vol. 8, Doc. 152, at 2–88. Currently, 450 vessels are permitted to use these fishing lines. *See* A.R. Vol. 45, Doc. H134, at 8–3.

Pelagic longline fishing and pelagic fish are subject to statutory and regulatory regimes, as well as international agreements, designed to protect HMS. The focus of this litigation is the final 1999 Highly Migratory Species Fishery Management Plan for Atlantic Tunas, Swordfish and Sharks ("HMS FMP"), promulgated by the National Marine Fisheries Service ("NMFS"), pursuant to its authority delegated by the Secretary of Commerce ("Secretary") under the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. §§ 1801–83 (West 2000).

Plaintiffs and intervenors claim that certain of the HMS FMP's regulations are arbitrary and capricious, as promulgated in the 1999 final HMS FMP and Amendment 1 to the Atlantic Billfish FMP ("Billfish Amendment"), 64 Fed.Reg. 29,090 (May 28, 1999), and the August 1, 2000 Closure Rule ("Closure Rule"), 65 Fed. Reg. 47,214 (Aug. 1, 2000) (codified at 50 C.F.R. pt. 635). National Coalition, The Billfish Foundation and A Fisherman's Best challenge the HMS FMP's alleged failure to minimize blue and white marlin bycatch to the extent practicable. A Fisherman's Best also challenges the HMS FMP's Closure Rule. The Environmental

Intervenors also assert that the HMS FMP fails to minimize blue and white marlin bycatch or establish a reliable bycatch reporting methodology, but support defendants' Closure Rule as consistent with the Magnuson–Stevens Act. Finally, intervenor-defendants, represented by Blue Water Fishermen's Association, claim that the Closure Rule does not violate the Magnuson–Stevens Act and that NMFS is not obligated to enact additional measures to minimize bycatch.[4]

Specifically, the plaintiffs each claim that the HMS FMP violates certain National Standards and other regulations set forth in the Magnuson–Stevens Act. *See* 16 U.S.C. §§ 1851(a)(1), (2), (4), (7)-(10); *see also* 16 U.S.C. §§ 1853(a)(10), (11), 1854(e)(3), 1854(g)(1)(C), (g)(1)(G)(ii)-(iii). A Fisherman's Best also asserts that in promulgating the HMS FMP, the defendant violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612, as amended by the Small Business Regulatory Enforcement and Fairness Act ("SBREFA"), Pub.L. No. 104–121, §§ 241–42, 101 Stat. 857, 864–68 (1996), by failing adequately to evaluate the HMS FMP's effect on small business entities.

## II. LEGAL FRAMEWORK

### A. The Magnuson–Stevens Act

The purpose of the Magnuson–Stevens Act is to protect HMS in waters extending two hundred (200) miles from the United States coast through conservation and management measures. *See* 16 U.S.C. §§ 1801(a), (b). Congress found that many HMS were "overfished"[5] and that as

---

3. HMS are statutorily defined as "tuna species, marlin ..., oceanic sharks, sailfishes ..., and swordfish." 16 U.S.C. § 1802(20) (parenthetical Latin terms omitted).

4. Blue Water Fishermen's Association does not seek relief beyond the relief sought by the

federal defendants' cross-motion for summary judgment.

5. Overfished is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustain-

a result of "increased fishing pressure" and "the inadequacy of fishery resource conservation and management practices," the survival of HMS "is threatened." 16 U.S.C. § 1801(a)(2). Congress also found that other species, while not technically overfished, were "so substantially reduced in number that they could become similarly threatened." *Id.*

The Magnuson–Stevens Act directs the Secretary to prepare "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield[6] from each fishery," 16 U.S.C. § 1801(b)(4), including HMS. *See* 16 U.S.C. § 1854(g)(1). The Act delegates that responsibility to NMFS. *Id.* A plan issued pursuant to the Magnuson–Stevens Act must be consistent with ten National Standards. *See* 16 U.S.C. § 1851(a). Plaintiffs altogether raise seven of these standards in their claims, arguing that the 1999 HMS FMP regulations at issue violated at least one of them. The standards at issue are:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the op-

timum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available. . . .

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges. . . .

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in

---

able yield on a continuing basis." 16 U.S.C. § 1802(29).

A fishery is "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational and economic characteristics; and (B) any fishing for such stocks." 16 U.S.C. § 1802(13).

Maximum sustainable yield ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i). The Code recognizes that "[a]ny MSY values used in determining [optimum yield] will necessarily be estimates, and these will typically be associated with some level of uncertainty. Such estimates must be based on the best scientific information available (see § 600.315) and must incorporate appropriate

consideration of risk (see § 600.335). Beyond these requirements, however, Councils have a reasonable degree of latitude in determining which estimates to use and how these estimates are to be expressed." 50 C.F.R. § 600.310(c)(2)(ii).

6. Optimum yield is "the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(28).

order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. §§ 1851(a)(1), (2), (4), (7)-(10).

Bycatch, a term used in National Standard Nine, is defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Bycatch does not include fish released alive under a recreational catch and release fishery management program." 16 U.S.C. § 1802(2). In other words, bycatch is fish that fishers catch but throw back into the ocean, either because they are not the kind of fish that people will buy (being too small, of the wrong gender or of bad quality), or because a regulation dictates that the fish cannot be kept. *See* 50 C.F.R. § 600.350(c). This second kind of bycatch is referred to as a regulatory discard. Regulatory discards may occur where certain fish species are so overfished that they cannot be kept or sold. *See* 50 C.F.R. § 622.32 (describing those species of fish which may not be harvested or possessed). All fish caught in excess of that limit must be discarded.

The regulations further require NMFS to minimize bycatch such that "[f]ish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive." 50 C.F.R. § 600.350(d). NMFS's regional councils must "[p]romote development of a database on bycatch and bycatch mortality in the fishery to the

extent practicable. A review and, where necessary, improvement of data collection methods, data sources, and applications of data must be initiated for each fishery to determine the amount, type, disposition, and other characteristics of bycatch and bycatch mortality in each fishery for purposes of this standard and of section [1853](a)(11) and (12) of the Magnuson–Stevens Act.... When appropriate, management measures, such as at-sea monitoring programs, should be developed to meet these information needs." 50 C.F.R. § 600.350(d)(1). NMFS shall "[s]elect measures that, to the extent practicable, will minimize bycatch and bycatch mortality." 50 C.F.R. § 600.350(d)(3).

In addition to the National Standards, several other Magnuson–Stevens Act provisions are at issue. First, the Act requires fishery management plans to "prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). Second, the Act also requires fishery management plans to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority—

(A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11). Third, the Act requires that when the Secretary prepares the HMS FMP, the plan should (1) "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors," and (2) ensure that conservation and management measures "take into consideration traditional fish-

ing patterns of fishing vessels of the United States and the operating requirements of the fisheries, [and] are fair and equitable in allocating fishing privileges among United States fishermen and do not have economic allocation as the sole purpose." *See* 16 U.S.C. §§ 1854(g)(1)(C), (g)(1)(G)(ii)-(iii).

## B. Standard of Review

■ The Magnuson–Stevens Act provides for judicial review of an HMS FMP under the same standards as those set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A)-(D). *See* 16 U.S.C. § 1855(f). The APA directs that "the reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[7]

■ In reviewing an agency's action to determine whether it was arbitrary and capricious, courts are constrained to review only those facts before the agency at the time of the action. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744, 105

S.Ct. 1598; *accord Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C.Cir.2000) (reversing the district court's order directing that the agency collect more evidence to support its position because the district court was empowered to decide the issue presented based solely on the information available to the agency).

■■ The APA standard accords great deference to agency decisionmaking, and the Secretary's action enjoys an initial presumption of validity. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Thus, even at the summary judgment stage, the scope of judicial review is narrow. *Id.* A court must engage in a searching and careful review of agency action but should not attempt to substitute its own judgment for the judgment of the agency. *Id.* at 416, 91 S.Ct. 814. Because the agency is expected to have expertise is its area, a certain degree of deference is due, particularly on issues about which experts disagree. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ Despite this deferential standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77

---

7. Defendants make a preliminary argument that National Coalition's and The Billfish Foundation's requests for relief should be denied as unavailable under the Magnuson–Stevens Act, 16 U.S.C. § 1855(f). (Federal Defs.' Combined Mem. Supp. Cross–Mot. for Summ. J. and in Opp'n to Pls.' Motions for Summ. J. ("Defs.' Mem.") at 20–22.) These plaintiffs have asserted that certain HMS FMP regula-

tions are arbitrary and capricious and have requested that the regulations be set aside and revised in a manner (such as imposing additional provisions) so as to comply with the Magnuson–Stevens Act. Plaintiffs' requests do not seek relief outside the scope of judicial review authorized by 16 U.S.C. § 1855(f). Therefore, defendants' preliminary argument cannot prevail.

L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). For an agency's decisionmaking to be rational under *Motor Vehicle Mfrs. Ass'n*, the agency "must respond to significant points raised during the public comment period" and "consider significant alternatives to the course it ultimately chooses." *Allied Local & Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C.Cir. 2000), *cert. denied*, 532 U.S. 1018, 121 S.Ct. 1956, 149 L.Ed.2d 752 (2001).

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment must provide the district court with a factual record sufficient to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This case involves parties' cross-motions for summary judgment as to certain administrative decisions in the 1999 HMS FMP. Specifically, at issue is whether the record supports the contention that the 1999 HMS FMP satisfies the substantive requirements set out by both the Magnuson–Stevens Act and the RFA.

## III. DISCUSSION

National Coalition and The Billfish Foundation, representing organizations involved in marine conservation, and A Fisherman's Best, representing pelagic longline fishers and fish dealers, challenge the HMS FMP's regulations that prevent pelagic longline fishing in certain coastal areas permanently or during certain times of the year (known as "closures"). For various reasons, each plaintiff alleges that

NMFS, in enacting these closures, violated certain federal statutory provisions. National Coalition alleges that NMFS violated National Standards One and Nine of the Magnuson–Stevens Act, certain fishery management plan requirements under the Magnuson–Stevens Act, 16 U.S.C. §§ 1853(a)(10)-(11), 1854(e)(3), and the APA, 5 U.S.C. §§ 706(2)(A), (C). The Billfish Foundation alleges that NMFS violated National Standard Nine of the Magnuson–Stevens Act, certain fishery management plan requirements under the Magnuson–Stevens Act, 16 U.S.C. § 1853(a)(1)(A), and the APA, 5 U.S.C. §§ 706(2)(A), (C). A Fisherman's Best alleges that NMFS violated National Standards One, Two, Four, Seven, Eight, Nine and Ten of the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(1), (2), (4), (7)-(10), certain allocation provisions of the Magnuson–Stevens Act, §§ 1854(g)(1)(C), 1854(g)(1)(G)(ii)-(iii), the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12, and the APA, 5 U.S.C. §§ 706(2)(A), (C).

### A. The Pelagic Longline Closures

NMFS enacted regulations in the HMS FMP to prevent pelagic longline fishers from landing certain overfished species in specific areas during all or part of the calendar year. Marlin is one of these overfished species. *See* A.R. Vol. 45, Doc. H134, at 8–1. NMFS has identified four discrete coastal closure areas, including (1) the East Coast Florida area (the "Florida Closure"), located offshore between Florida's east coast and up through Georgia, to be closed year-round as of February 1, 2001, *see* 65 Fed.Reg. 47,214; (2) the Charleston Bump area, located near Wilmington Beach, North Carolina, to be closed from February 1 through April 30 each year, *see id.;* [8] (3) a horizontal, rect-

---

**8.** NMFS subsequently delayed the effective

dates of the Florida Closure and the Charles-

angular area off the New Jersey coast, to be closed during the month of June each year, 50 C.F.R. § 635.21(c)(2); and (4) the DeSoto Canyon area, located off of Florida's west coast, to be closed year-round as of November 1, 2000.

Plaintiffs all allege that these closure regulations fail to protect marlins and minimize marlin bycatch in accordance with the Magnuson–Stevens Act's National Standards, and, therefore, NMFS acted in an arbitrary and capricious manner when it implemented the closures. A Fisherman's Best also argues that the Florida Closure imposes economic and social harms on Florida East Coast pelagic longline fishers, who primarily target swordfish, and the fish dealers and fish processors who depend upon them. Because these fishers own small vessels that cannot safely travel to waters outside of the closure area, plaintiff contends, the Florida Closure will essentially shut down the Florida East Coast fishing industry. (A Fisherman's Best Mem. of Points & Auth. Supp. Mot. for Summ. J. ("Fisherman's Best Mem.") at 2.)

**1. National Standard Two**

■ National Standard Two requires the agency to base its regulations "upon the best scientific information available." 16 U.S.C. § 1851(a)(2). A Fisherman's Best argues that NMFS violated National Standard Two, because it "failed to utilize the information it had available." (Fisherman's Best Mem. at 36.) Rather, it claims, the Florida Closure was not based on scientific data, but resulted from "a compromise based on legal and lobbying pressure

from environmental and recreational groups." (*Id.* at 37 (citing A.R. Vol. 52, Docs. H227–38, H258–67).)

■ NMFS argues that it used pelagic logbook data, which constitutes the best information available, to establish bycatch regulations. The regulations require an agency to base its determinations on information available at the time of preparing the HMS FMP or implementing the regulations. *See* 50 C.F.R. § 600.315(b)(2). A court cannot require NMFS to obtain better data. *See Southwest Ctr. for Biological Diversity,* 215 F.3d at 61 (stating that the district court must assess the agency's evidence and resolve the parties' dispute, and it cannot "sidestep this responsibility by imposing an obligation upon the Secretary to find better data").

NMFS used pelagic logbook entries from 1993 to 1998, together with NMFS biologists' analyses of this data, to identify the most beneficial time/area closures. A.R. Vol. 45, Doc. H134, at 1–6—1–7, B–28—B–29. Despite National Coalition's argument that underreporting causes logbooks to be unreliable (*see* National Coalition's Mem. Supp. Mot. for Summ. J. ("National Coalition's Mem.") at 17–19), logbooks are the best available scientific information because, unlike observer records, logbooks reflect data from the universe of pelagic fishers and not merely a sampling of them. Therefore, logbooks are "more complete with respect to documenting the full spatial and temporal range of fishing effort" and better determine "catch and bycatch trends and patterns across time and fishing areas."

ton Bump closure until March 1, 2001, to correct the coordinates of the closed areas and to distribute this information to affected fishers and law enforcement. *See* 66 Fed. Reg. 8,903 (Feb. 5, 2001). On March 30, 2001, NMFS proposed to extend the Charleston Bump closure through May 31, 2001. *See*

66 Fed.Reg. 17,389 (Mar. 30, 2001). NMFS withdrew this proposal on May 7, 2001, finding that the extension would cause negative economic and social impacts on fishers and dealers. *See* 66 Fed.Reg. 22,994 (May 7, 2001).

(Defs.' Mem. at 26.) To the extent that the logbooks *underreport* billfish catch and bycatch, NMFS's conservation measures will result only in *greater* conservation benefits. (*Id.*)

Even if the logbooks underreport a certain amount of catch and bycatch, plaintiffs have not pointed to any other information either available or appropriate for NMFS to consider during the rulemaking process. The record demonstrates that NMFS used the best information available when NMFS established the conservation-based regulations. *See* 50 C.F.R. § 600.315(b) ("fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP"); *Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir.1999) (NMFS may regulate species even if it lacks complete information); *A.M.L. Int'l, Inc. v. Daley*, 107 F.Supp.2d 90, 101 (D.Mass.2000) ("The fact that scientific information is incomplete, however, does not prevent the implementation of a fishery management plan."); *Parravano v. Babbitt*, 837 F.Supp. 1034, 1046 (N.D.Cal.1993) ("By requiring that decisions be based on the best scientific information available, the [Magnuson–Stevens] Act acknowledges that such information may not be exact or totally complete."), *aff'd*, 70 F.3d 539 (9th Cir.1995), *cert. denied*, 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996); *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. 210, 220 (D.D.C.1990) (holding that "the Court will not construe the Magnuson[-Stevens] Act to tie the Secretary's hands and prevent him from conserving a given species of fish whenever its very nature prevents the collection of complete scientific information"). Accordingly, challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Two.

### 2. National Standard Four

■ National Standard Four prohibits NMFS from establishing "allocation"-based regulations that "discriminate between residents of different States," and requires that, if NMFS must allocate, NMFS must do so in a manner that is "fair and equitable" to all affected fishers, "reasonably calculated to promote conservation," and carried out such that "no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). An "allocation" is a "direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals." 50 C.F.R. § 600.325(c)(1). A Fisherman's Best argues that NMFS violated National Standard Four, because the Florida Closure discriminates against, and imposes undue burdens on, Florida fishers, businesses and residents dependent upon the pelagic longline industry. (Fisherman's Best Mem. at 30–32.) Plaintiff also alleges that NMFS intended to discriminate against the Florida fishing communities, as shown by NMFS's failure to consider other areas for permanent closure despite its knowledge that Florida's fishing communities depend upon small vessels that cannot operate beyond the Florida Closure. (*Id.* at 31–32.) Namely, NMFS chose to forego closures in the Eastern Atlantic region and "rescinded" a closure in the western Gulf of Mexico to protect Louisiana residents. (*Id.* at 31.) In addition, plaintiff asserts that NMFS failed to comply with federal regulations requiring the agency to analyze whether the Florida Closure caused a group to acquire "an excessive share of fishing privileges." 50 C.F.R. § 600.325(c)(3)(iii); *see also Commonwealth v. Daley*, 170 F.3d 23, 31 (1st Cir.1999).

NMFS counters that A Fisherman's Best's discrimination allegations are un-

founded for several reasons. First, NMFS implemented a closure in the northeast Atlantic, in addition to the Charleston Bump and Florida closures. *See* 64 Fed. Reg. 29,090, 29,145. Second, NMFS never "rescinded" the western Gulf of Mexico closure, because NMFS never implemented the proposed closure in the first place. *See* 64 Fed.Reg. 69,982 (Dec. 15, 1999). There is no evidence that NMFS decided not to implement the Gulf closure to protect Louisiana residents, as plaintiff alleges. (Defs.' Mem. at 43.) Third, the Florida Closure is a conservation measure to reduce bycatch and is not a type of allocation measure addressed by National Standard Four. *See* 50 C.F.R. § 600.325(c)(1). Finally, while NMFS recognizes that the Florida Closure disadvantages some fishers, NMFS considered fairness and equity when it established this closure as a conservation measure with no discriminatory intent. (Defs.' Mem. at 44–46 (citing A.R. Vol. 45, Doc. H134, at 10–3—10–4).)

The Florida Closure would be considered an "allocation" of fishing privileges only if it results "in direct distributions of fishing privileges .... Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type, different quotas or fishing seasons for recreational and commercial fishermen, assignment of ocean areas to different gear users, and limitation of permits to a certain number of vessels or fishermen." 50 C.F.R. § 600.325(c)(1). A regulation that has "incidental allocative effects," by contrast, is not an "allocation." *Id.* While the Florida Closure may have incidental allocative effects, the regulation does not directly distribute fishing privileges, quotas or ocean areas among different groups of fishers. Therefore, the Florida Closure is not an "allocation" under National Standard Four.

Even if the Florida Closure were construed to be an allocation measure, however, an HMS FMP "may contain management measures that allocate fishing privileges if such measures are necessary or helpful in furthering legitimate objectives or in achieving the [optimum yield], and if the measures conform with paragraphs (c)(3)(i) through (c)(3)(iii) of this section." 50 C.F.R. § 600.325(c), (c)(3)(i)-(iii) (requiring such measures to be implemented with "[f]airness and equity," to "[p]romote conservation" and to avoid giving "excessive shares" of fishing privileges to any person or entity). NMFS has shown, as the regulations require, that the Florida Closure furthers the "legitimate FMP objective" of reducing bycatch. 50 C.F.R. § 600.325(c)(3)(i)(A). Because Congress recognized that "[i]nherent in an allocation is the advantaging of one group to the detriment of another," Congress permitted allocations that "may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups." 50 C.F.R. §§ 600.325(c)(3)(i)(A), (B). More specifically, an "allocation need not preserve the status quo in the fishery to qualify as 'fair and equitable,' if a restructuring of fishing privileges would maximize overall benefits." 50 C.F.R. § 600.325(c)(3)(i)(B). This regulation is particularly relevant to this case, where the record shows that the Closure Rule will provide conservation benefits to other fish species in addition to billfish. A.R. Vol. 45, Doc. H134, at 7–23—7–24. (*See also* Environmental Intervenors' Reply in Supp. of Defs.' Mem. Against Pls. A Fisherman's Best, *et al.* ("Environmental Intervenors' Reply") at 3.)

Accordingly, NMFS evaluated the benefits and costs imposed by the Florida Closure, and compared its consequences with those of alternative allocation schemes, including the "status quo." A.R. Vol. 45,

H134, at 7–53. In determining whether the Florida Closure discriminates against Florida fishers and fishing communities in violation of National Standard Four, the regulations are particularly instructive:

Conservation and management measures that have different effects on persons in various geographic locations are permissible if they satisfy the other guidelines under Standard 4. [For example,]

. . .

[a]n FMP that closed a spawning ground might disadvantage fishermen living in the state closest to it, because they would have to travel farther to an open area, but the closure could be justified under Standard 4 as a conservation measure with no discriminatory intent.

50 C.F.R. § 600.325(b)(2). NMFS recognized that "with respect to [National Standard] 4, the time/area closures could disadvantage fishermen living in the state adjacent to the closed areas because they would have to travel to an open area," but decided to implement the closures based on species concentration to reduce bycatch and further conservation measures "with no discriminatory intent." A.R. Vol. 45, Doc. H134, at B3, 10–3—10–4.

Plaintiff has not shown that the Florida Closure is unfair, inequitable or fails to promote conservation under National Standard Four. *See Alliance Against IFQs v. Brown,* 84 F.3d 343, 350 (9th Cir.1996) (holding that the Secretary's approval of a plan which allocated benefits to fishers who owned or leased boats, to the detriment of non-owning crew members, did not violate the Magnuson–Stevens Act because the tension between different National Standards "necessarily requires that each goal be sacrificed to some extent to [meet] the others"), *cert. denied,* 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997); *Alaska Factory Trawler Ass'n v.*

*Baldridge,* 831 F.2d 1456, 1464 (9th Cir. 1987) (holding that gear restrictions allegedly favoring Alaskan longline fishers to the detriment of non-Alaskan trawlers and pot fishers did not violate National Standard Four because the restriction also promoted sablefish conservation); *Sea Watch Int'l v. Mosbacher,* 762 F.Supp. 370, 376–78 (D.D.C.1991) (holding that a quota scheme alleged to discriminate against smaller fishing fleets, and ultimately drive them out of business, did not violate National Standard Four because " '[i]nherent in an allocation is the advantaging of one group to the detriment of another,' " and "nothing prevent[ed] coalitions of small owners from pooling their allocations to obtain efficiencies") (citing 50 C.F.R. § 602.14(c)(3)(i)). Accordingly, the challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Four.

### 3. National Standard Seven

■ National Standard Seven provides that NMFS's "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). A Fisherman's Best argues that NMFS implemented the closure without analyzing alternative conservation measures, despite the agency's recognition that the Florida Closure "will force many small entities, such as fishermen and dealers, out of business." (Fisherman's Best Mem. at 35–36.) Therefore, plaintiff asserts, NMFS violated National Standard Seven because "a less costly approach was practicable." *(Id.)*

NMFS recognized that while the Florida Closure could cause "many fishermen, dealers, and related industries [to] go out of business" and impose "significant negative economic impacts," the closure also would have "positive biological impacts."

A.R. Vol. 45, Doc. H134, at App. B–31, B–38, Doc. H147, at 47228; A.R. Vol. 53, Doc. H361, at 2. NMFS considered alternatives to determine which combination of regulations would best achieve the agency's conservation goals and minimize the economic impact on fishing communities. *See* A.R. Vol. 45, Doc. H134, at 7–3—7–31, 7–53, 7–59. Plaintiff has not specified any record evidence showing that NMFS ignored a less costly, practicable approach or that NMFS's regulations cause "unnecessary duplication," as National Standard Seven prohibits. The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Seven.

#### 4. National Standard Eight

■ A Fisherman's Best argues that the Florida Closure's economic costs are not justified under National Standard Eight's requirement that NMFS must, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). Specifically, plaintiff asserts, "NMFS knew that the Florida East Coast pelagic longline vessels were designed and used for near shore fishing and that the vessels' limited size prevented them from transiting open areas without great risk to vessels and crew [and] the Florida Closure Rule would mean the economic elimination of many pelagic longline fishermen's livelihoods in Florida, as well as the elimination of shore-side businesses dependent upon the local pelagic longline catch." (Fisherman's Best Mem. at 27.) In addition, plaintiff contends that NMFS failed to consider alternatives or provide meaningful assistance to the affected fishing communities that would have minimized the harmful economic impacts while achieving conservation goals. (*Id.* at 28–29.)

NMFS recognized that the Florida Closure would have negative economic impacts upon pelagic longline fishers. *See* A.R. Vol. 45, Doc. H134, at App. B–31, B–38, Doc. H147, at 47228; A.R. Vol. 53, Doc. H361, at 2. NMFS analyzed various alternatives, including a "no action" alternative, yet determined that the bycatch reduction and conservation benefits from the Florida Closure would outweigh its costs. *See* A.R. Vol. 45, Doc. H134, at 7–3—7–31, 7–53, 7–59. NMFS also considered part-year closure alternatives. A.R. Vol. 45, Doc. H134, at 7–21—7–22; (*see* Environmental Intervenors' Reply at 7–8.) NMFS complied with National Standard Eight's requirement "that an FMP take into account the importance of fishery resources to fishing communities ... within the context of the conservation requirements of the Magnuson–Stevens Act. Deliberations regarding the importance of fishery resources to affected fishing communities, therefore, must not compromise the achievement of conservation requirements and goals of the FMP." 50 C.F.R. § 600.345(b)(1); *see also Natural Resources Defense Council v. Daley*, 209 F.3d 747, 753 (D.C.Cir.2000) (holding that NMFS "must give priority to conservation measures" when balancing the tension between the Magnuson–Stevens Act's National Standards). NMFS fulfilled its statutory obligations when it evaluated and selected closure and bait restriction alternatives that would achieve conservation requirements while minimizing the Florida Closure's impact "to the extent practicable." 16 U.S.C. § 1851(a)(8). The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Eight.

#### 5. National Standard Ten

■ A Fisherman's Best also alleges that the Florida Closure violates National Standard Ten's requirement that NMFS

must, "to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10). Because the Florida fishers operate small vessels that are not capable of fishing safely beyond the closure limits, plaintiff argues, NMFS effectively has forced these fishers to risk their lives or their livelihoods. (Fisherman's Best Mem. at 40–41.)

NMFS considered that Florida fishers may attempt to travel beyond the closure area, thus compromising their safety. A.R. Vol. 45, Doc. H134, at B–25—B–26. NMFS pointed out, however, that whether the fishers choose to undertake these risks is beyond NMFS's control, and the fishers have the opportunity to explore other, non-risky options. (Defs.' Mem. at 51 & n. 17.)[9] Nevertheless, plaintiff has the burden to show that defendants violated National Standard Ten in the first instance. Plaintiff has not pointed to any record evidence showing that the HMS FMP fails to "promote the safety of human life at sea," as National Standard Ten requires. Without evidence that "the Secretary act[ed] in an arbitrary and capricious manner in promulgating such regulations, [the regulations] may not be declared invalid." *Alaska Factory Trawler Ass'n,* 831 F.2d at 1460 (citing 16 U.S.C. § 1855(d); 5 U.S.C. § 706(2)(A)). The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Ten.

## B. Blue Marlin and White Marlin Bycatch

For approximately thirty years, Atlantic marlin biomass levels have been below the level necessary to produce MSY. *See* A.R.

Vol. 45, Doc. H134, at 5–2; *see also* Doc. H134, at 8–1 (listing marlin as an overfished species). As of October 2000, Atlantic blue marlin biomass was estimated to be 40% of the size needed to achieve MSY, and Atlantic white marlin biomass was estimated to be 15% of the size needed to achieve MSY. (National Coalition's Mem. at 3 & n. 3 (citing Report of the Standing Committee on Research and Statistics ("SCRS"), Blue Marlin Executive Summary at 2 (Oct.2000) (Ex. A)).) In addition, the Report concluded that the fishing rate for blue marlin is four times the maximum sustainable rate, the fishing rate for white marlin is seven times the maximum sustainable rate and, therefore, NMFS should establish time/area closures to conserve marlin. (*Id.*)

Plaintiffs National Coalition and The Billfish Foundation challenge the HMS FMP's August 1, 2001 Closure Rule that has taken measures to reduce bycatch of various other HMS, but allegedly has not taken adequate steps to minimize blue marlin and white marlin (collectively, "marlin") bycatch. National Coalition, The Billfish Foundation and A Fisherman's Best allege that NMFS's pelagic longline closures and simultaneous failure to enact measures to conserve marlin violates National Standard Nine of the Magnuson–Stevens Act and the APA, 5 U.S.C. §§ 706(2)(A), (C). In addition, A Fisherman's Best alleges that the HMS FMP violates National Standard One. National Coalition also alleges that the HMS FMP violates certain fishery management plan requirements under the Magnuson–Stevens Act, 16 U.S.C. §§ 1853(a)(11), 1854(e)(3),[10] and The Billfish Foundation

---

**9.** While NMFS is not directly responsible for a fisher's choice to undertake risks, NMFS has not shown that its suggested "options" for the fishers to move or exit the fishery (Defs.' Mem. at 51), are feasible options at this stage.

**10.** National Coalition alleged in its Amended Complaint that the Florida Closure fails to end overfishing and rebuild the blue and white marlin fishery, in violation of National Standard One and § 1853(a)(10). (*See* Na-

alleges that the HMS FMP violates 16 U.S.C. § 1853(a)(1)(A).

## 1. National Standard One

■ National Standard One requires NMFS's regulations to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1); *see also* 16 U.S.C. § 1853(a)(10) (providing that for overfished fisheries, an HMS FMP shall "contain conservation and management measures to . . . end overfishing and rebuild the fishery"). A Fisherman's Best argues that the Florida Closure regulation violates National Standard One, "because the optimum yield of Atlantic billfish—blue and white marlin and sailfish—will likely not be promoted through the closures of the Florida coasts." (Fisherman's Best Mem. at 40.) As justification for its assertion, A Fisherman's Best relies on an assumption that fishers who normally fished in the Florida Closure will start to fish in non-closure areas of the Atlantic Ocean and the Caribbean Sea (known as the "effort redistribution model"), thereby increasing billfish bycatch. (*Id.* at 4, 12, 37–38; *see also* The Billfish Foundation's Mem. of Facts and Law in Supp. of Pls.' Mot. for Summ. J. ("Billfish Mem.") at 21, 30–32.)

Plaintiffs' arguments are not supported by the record evidence. NMFS is statutorily required to set out a plan that stops overfishing and rebuilds the stock of fish as quickly as possible. *See.* 16 U.S.C. § 1854(e)(4)(A)(i). The statutory "optimum yield" definition recognizes that optimum yield is a standard that should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year. *See* 50 C.F.R. § 600.310(f)(1)(ii) ("[i]n national standard 1, . . . 'achieving, on a continuing basis, the [optimum yield] from each fishery' means producing, from each fishery, a long-term series of catches such that the average catch is equal to the average [optimum yield]"); *C & W Fish Co., Inc. v. Fox,* 931 F.2d 1556, 1563 (D.C.Cir.1991) (holding that "an FMP can comply with [National] Standard 1 if there are social, economic or ecological factors that justify the pursuit of a yield less than the maximum sustainable yield").

A Fisherman's Best even recognizes that, consistent with National Standard One's requirements, NMFS took action to rebuild overfished marlin stock, which has been below its MSY for the past thirty years. (Fisherman's Best Mem. at 39.) Contrary to The Billfish Foundation's and A Fisherman's Best's arguments, NMFS's studies led the agency to conclude that the Florida Closure's effects would fall in between the effort redistribution model and the "no redistribution of effort model," which assumes that fishers normally fishing in a newly-closed area would not fish elsewhere. A.R. Vol. 45, Doc. H147, at 47,225; (Defs.' Mem. at 27, 36–37.) [11]

tional Coalition's Am. Compl. ¶¶ 86–103.) National Coalition does not, however, address these alleged National Standard One and § 1853(a)(10) violations in its summary judgment motion.

**11.** NMFS's conclusion is supported by the Administrative Record and deserves deference. In fact, National Coalition even relied solely on the no redistribution of effort model, admitting that the effort redistribution model

is unlikely to occur, because the "relatively small boats being excluded from the fishing grounds in the South Atlantic are unlikely to fish in those relatively distant areas. Therefore, the [effort redistribution] model is even less applicable to the bycatch of blue and white marlin." (National Coalition Mem. at 14–15 n. 4.) In addition, A Fisherman's Best recognized that the ultimate effect was likely to be in between the two models. (*See* Fisherman's Best Mem. at 12–13 n. 11, 18 n. 14

NMFS has the discretion to undertake the measures it determines will best rebuild the fishery, and attaining optimum yield, which is determined by the maximum sustainable yield in cases of overfished fisheries, *see* 16 U.S.C. § 1802(28), does not have to be a primary imperative in light of NMFS's statutorily-mandated conservation objectives. *See C & W Fish Co., Inc.*, 931 F.2d at 1563. The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard One.

### 2. National Standard Nine

■ National Standard Nine provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(9). National Coalition argues that NMFS acted in an arbitrary and capricious manner by declining to reduce marlin bycatch through time/area closures, limit the length of longlines or require that fishers use circle hooks, a method which may reduce bycatch. (National Coalition Mem. at 11, 26–27.) In addition, National Coalition asserts that NMFS improperly abandoned its plan for a western Gulf of Mexico time/area closure in favor of a less effective ban on live bait to reduce marlin bycatch. (*Id.*) This regulation prohibiting live bait would reduce billfish bycatch by approximately 3%. A.R. Vol. 45, Doc. H134, at 7–63, Table 7.21.

National Coalition further argues that NMFS failed to analyze the potential for reducing marlin bycatch by closing areas in the Mid–Atlantic or the Caribbean, despite the fact that pelagic longline fishing in the Caribbean accounts for 50% of the total Atlantic-wide blue marlin discards and 32% of the total Atlantic-wide white marlin discards. (National Coalition Mem. at 30–32.) As a result, National Coalition maintains that NMFS reduced blue and white marlin bycatch by "only" 15% and 9%, respectively, assuming that fishers normally fishing in a newly-closed area would not fish elsewhere (referred to above as the "no redistribution of effort model"). (*Id.* at 14, 27, 32–33 (citing A.R. Vol. 45, Doc. H134, at 7–24, 7–63).) Thus, National Coalition argues, this marginal bycatch improvement, the small bycatch improvement resulting from the live bait restriction, and the summary dismissal of closure options, shows that NMFS failed to minimize bycatch to the extent practicable as National Standard Nine requires.[12]

Likewise, The Billfish Foundation and A Fisherman's Best argue that the NMFS failed to minimize bycatch, as evidenced from NMFS's findings that other closure measures actually could cause marlin bycatch to *increase*. (Billfish Mem. at 22–23, 31 (citing A.R. Vol. 44, Doc. 115, at 2, 26, Doc. 117, at 6, Docs. 118–119 & H122; Vol. 45, Doc. H147; Fisherman's Best Mem. at 35–38.) The Billfish Foundation further asserts that NMFS based its regulations on insufficient information as to whether the no redistribution of effort model assumption was even plausible. (Billfish Mem. at 31–32.) Indeed, The Billfish

(citing A.R. Vol. 45, Doc. H134, at 7–4, 7–23—7–25; Vol. 55, Doc. H000868, at 16–20).)

**12.** Intervenor-defendant Blue Water Fishermen's Association argues that this "case is not truly about bycatch [and, instead, National Coalition's] agenda is that pelagic longlining should be regulated to extinction." (Blue Water Fishermen's Association's Mem. Supp. Mot. Summ. J. and in Opp'n to Certain Pls.' Motions for Summ. J. ("Blue Water Ass'n's Mem.") at 10.) Blue Water Fishermen's Association has not, however, pointed to any evidence showing that National Coalition's claims seek results that are not apparent from National Coalition's Amended Complaint.

Foundation and A Fisherman's Best assert that there is a possibility the closures will *increase* marlin (and other marine species) bycatch if fishers who normally fished in the closure areas now start to fish in non-closure areas of the Atlantic Ocean and the Caribbean Sea (referred to above as the "effort redistribution model"). (*Id.* at 21, 30–32; Fisherman's Best Mem. at 4, 12, 37–38; *but see* National Coalition Mem. at 14–15 n. 4 (relying on the no redistribution of effort model and finding that the effort redistribution model was unlikely to occur).) Thus, plaintiffs claim, in enacting the HMS FMP, NMFS acted in an arbitrary and capricious manner by failing to comply with National Standard Nine.

NMFS is required to minimize bycatch only "to the extent practicable," and, "to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. §§ 1851(a)(9)(A), (B). "Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive." 50 C.F.R. § 600.350(d). Since 1999, United States commercial fishers have been prohibited from retaining billfish that they catch in the Atlantic Ocean. (Defs.' Mem. at 33 (citing A.R. Vol. 37, Doc. B92, at i–7).) This prohibition means that billfish are caught only incidentally, before being released dead or alive back into the sea. Therefore, NMFS would have to eliminate *all* pelagic fishing to guarantee a further reduction in billfish bycatch. (*Id.; see also* Blue Water Ass'n's Mem. at 2); A.R. Vol. 45, Doc. H134, at 6–3, Table 6.3 (showing that 58% to 74.4% of the billfish bycatch are released alive, and

the remaining are released dead). NMFS has found that eliminating all pelagic longline fishing is not a reasonable alternative. (Defs.' Mem. at 33 (citing A.R. Vol. 37, Doc. B92, at i–7).)

NMFS maintains that it has minimized billfish bycatch to the extent practicable by establishing the 1999 billfish regulation, together with the August 1, 2000 Closure Rule and a ban on live bait longlining in the Gulf of Mexico. (*Id.* at 33–37.) NMFS does not dispute that the Florida Closure is unlikely to reduce billfish bycatch as much as it will reduce bycatch for other overfished species. NMFS determined, however, that it was not practicable to establish closures for the primary purpose of reducing billfish bycatch, because billfish are widely distributed throughout the Atlantic and the Gulf of Mexico. (*Id.* at 34 (citing A.R. Vol. 8, Doc. 152a, at 3–209—3–210).) In addition, because billfish make up only approximately 1.25% of United States pelagic longline catch,[13] and most are released alive,[14] plaintiffs have not shown that further regulations to reduce bycatch would be practicable. (Blue Water Ass'n's Mem. at 11–12.) NMFS analyzed various alternatives to find the combination that would best meet the Magnuson–Stevens Act's objectives of reducing bycatch while minimizing economic costs to the extent practicable. A.R. Vol. 45, Doc. H134, at 7–3—7–31, 7–53, 7–59. As discussed above, NMFS determined that the Florida Closure's effects would fall in between the effort redistribution and the no redistribution of effort models. A.R. Vol. 45, Doc. H147, at 47,225; (Defs.' Mem. at 27, 36–37.)[15] NMFS also con-

---

13.  Of the United States pelagic longline catch, 0.49% is Atlantic blue marlin, 0.49% is Atlantic white marlin, 0.20% is west Atlantic sailfish and 0.07% is longbill spearfish. A.R. Vol. 45, Doc. H134, at 6–3, Table 6.3.

14.  The record shows that 74.4% of blue marlin are released alive, 68.8% of white marlin

are released alive, 58% of west Atlantic sailfish are released alive and 64.7% of longbill spearfish are released alive. A.R. Vol. 45, Doc. H134, at 6–3, Table 6.3.

15.  In addition, NMFS determined that the effort redistribution model actually overestimated the negative effects imposed on marlin

cluded that imposing a live bait restriction in conjunction with the closures would best minimize billfish bycatch, including sailfish and marlin. A.R. Vol. 45, Doc. H134, at B–17; (Defs.' Mem. at 37.)

In addition, contrary to National Coalition's assertion, NMFS did enact closures in the Mid–Atlantic and the Caribbean to minimize billfish bycatch. *See* 64 Fed.Reg. 29,090, 29,145; A.R. Vol. 37, Doc. B92, at 2–10; Vol. 45, Doc. H134, at B16–17, 6–9, 7–25; Vol. 54, Docs. H653, H682; (Defs.' Mem. at 39–40; Blue Water Ass'n's Mem. at 31, 34.) [16] NMFS also considered closing an area in the western Gulf of Mexico, as National Coalition had suggested (National Coalition Mem. at 11, 26–27), but determined that a live bait restriction was preferable to minimize adverse economic impacts against fishers in that area. A.R. Vol. 45, Doc. H134, at 8–8—8–9 (finding that a western Gulf of Mexico closure would cause twenty-three percent of vessels to lose five percent of their revenue, whereas an alternative closure in the De-Soto Canyon would cause thirteen percent of vessels to lose five percent of their revenue).

NMFS analyzed the record evidence and conservation alternatives, and determined that the Florida Closure was necessary and the best means of attaining the agency's conservation objectives with regard to the HMS fisheries. NMFS has the discretion to make this determination. *See National Fisheries Inst. v. Mosbacher*, 732 F.Supp. at 223 ("[T]his question of whether certain billfish conservation and management measures would be in the nation's 'best interest' is 'a classic example of a factual dispute the resolution of which im-

plicates substantial agency expertise.... It is therefore especially appropriate for me to defer to the expertise and experience of [the agency].' ") (internal citations omitted). The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate National Standard Nine.

### 3. Bycatch Reporting Methodology

■ The Magnuson–Stevens Act requires NMFS to include in the HMS FMP "a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." 16 U.S.C. § 1853(a)(11). NMFS requires longline fishers to self-report their bycatch in logbooks and submit their logbooks to NMFS. *See* A.R. Vol. 8, Doc. 152a, at 292. When selected, a fisher must carry an observer on his or her fishing trip. *Id.* at 299. The observer records the fisher's catch, disposition of all species, fishing gear and location. *Id.* NMFS then compares the observer's information with the fisher's logbook reports to determine inconsistencies, adjust catch rates and compile Stock Assessment and Fishery Evaluation Reports that are used in proposing regulations. *Id.* (*See also* Defs.' Mem. at 23–24.)

National Coalition argues that NMFS failed to enact regulations that will prevent fishers from underreporting their discards under the logbook method, including provisions for greater observer coverage. (*Id.* at 15–24, 37–38 (citing A.R. Vol. 42, Doc. H21, at 14; Vol. 8, Doc. 152, at 3–249).) This omission, National Coalition asserts, shows that NMFS failed to conduct the

---

bycatch, because many of the affected vessels are too small to fish outside of the closure areas. (Defs.' Mem. at 36 (citing A.R. Vol. 45, Doc. H134, at 7–25).)

**16.** A Fisherman's Best also asserted that NMFS should have considered these areas for closures, but, unlike National Coalition, did not go so far as to assert that NMFS had failed to do so. (Fisherman's Best Mem. at 15.)

assessment that federal regulations require. (*Id.* at 36–37, 38 (citing 50 C.F.R. § 600.350(d)(1)).)[17] National Coalition further argues that, even though "given current fiscal constraints, NMFS will not likely be able to significantly increase observer coverage in the pelagic longline fishery," 65 Fed.Reg. at 47,218, "lack of funding does not excuse compliance with a mandatory statutory command." (National Coalition Mem. at 24, 39.) In addition, NMFS alternatively could have increased the percentage of observer coverage by limiting the number of pelagic longline fishing trips. (*Id.*)

NMFS argues that the logbooks and observer data provide standardized reporting methodology as § 1853(a)(11) requires. Specifically, NMFS has complied with IC-CAT's recommendation that NMFS seek an objective of ensuring that five percent of longline vessels have observer coverage. Although in 1998 only 2.9% of longline vessels had observer coverage, between 1992 and 1998, four to five percent of longline vessels had observer coverage. (Defs.' Mem. at 24 (citing 65 Fed.Reg. 47,214, 47,218).) NMFS maintains that this level of coverage is sufficient to establish standardized reporting. Furthermore, the record shows that logbook data are generally consistent with observer data. A.R. Vol. 40, Doc. B314; Vol. 55, Doc. H843, at 7 ("the logbook and observer data using identified and unidentified billfish observations provide generally consistent predictions"). (*See also* Blue Water Ass'n's Mem. at 42.) In addition, limiting the number of fishing trips would not in-

crease the percentage of observer coverage, as National Coalition suggests, because fishers would make longer trips, which, in turn, increase the observer costs. Thus the percentage of observer coverage would remain the same. (*Id.* at 25.)

Even National Coalition recognized that the record does not provide absolute evidence that underreporting is or will be occurring as a result of NMFS's current regulatory strategy. (*Id.* at 19–21.) *See* A.R. Vol. 48, Doc. H168, at 244 (speculating that the drop in the number of billfish caught after 1991 "is possibly a consequence in the change in reporting trends," namely, underreporting); A.R. Vol. 27, Doc. A3, App. 5, at 4 (observing that a "comparison between logbook and observer data indicates that underreporting of about 25% of the billfish bycatch may be occurring"); A.R. Vol. 40, Doc. B267, B314 (speculating that the logbook reporting method "may not be accurate for very rare species," such as billfish). In addition, National Coalition has not provided sufficient evidence that there is inadequate observer data for NMFS to comply with its Magnuson–Stevens Act obligations (*see* National Coalition Mem. at 21 (arguing that "NMFS relied on logbook data ... presumably because observer data was too rare to allow for full analysis")), or that any existing shortage of observer coverage has impeded NMFS's ability to enforce its current regulations. (*Id.* at 23 (asserting that "it is difficult to fathom how NMFS is enforcing the gear modification NMFS *did*

---

**17.** As discussed in Part II(A), *infra,* section 600.350(d)(1) provides in relevant part that NMFS's regional councils must "[p]romote development of a database on bycatch and bycatch mortality in the fishery to the extent practicable. A review and, where necessary, improvement of data collection methods, data sources, and applications of data must be initiated for each fishery to determine the amount, type, disposition, and other characteristics of bycatch and bycatch mortality in each fishery for purposes of this standard and of section [1853](a)(11) and (12) of the Magnuson–Stevens Act.... When appropriate, management measures, such as at-sea monitoring programs, should be developed to meet these information needs." 50 C.F.R. § 600.350(d)(1).

impose—the ban on live bait—without adequate observer coverage").)

Merely asserting that NMFS did not "determine what the proper level of observer coverage would be to detect a statistically significant number of blue and white marlin discards" or that "NMFS agrees that it would be beneficial to increase observer coverage to document bycatch in all HMS fishing sectors" (*id.* (citing 65 Fed.Reg. at 47,218)), is not enough to show that NMFS failed to comply with 16 U.S.C. § 1853(a)(11) or 50 C.F.R. § 600.350(d)(1) in enacting the HMS FMP. Accordingly, the challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate 16 U.S.C. § 1853(a)(11) or 50 C.F.R. § 600.350(d)(1).

### C. Economic Effects on Pelagic Longline Fishers

### 1. Fair Allocation of Restrictions and Benefits Among HMS Fisheries

█ The Magnuson–Stevens Act requires the HMS FMP to "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors," and ensure that conservation and management measures "take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries, [and] are fair and equitable in allocating fishing privileges among United States fishermen and do not have economic allocation as the sole purpose." *See* 16 U.S.C. §§ 1854(g)(1)(C), (g)(1)(G)(ii)-(iii).

A Fisherman's Best claims that the Florida Closure violates these provisions by imposing economic and social harms solely on Florida East Coast pelagic long-

line fishers, fish dealers and fish processors. "NMFS never explored whether swordfish bycatch reduction goals could be met by measures that would not destroy Florida's pelagic longline fishing communities." (Fisherman's Best Mem. at 3.) Specifically, plaintiff claims that there are many other areas of the Atlantic where swordfish bycatch and marlin bycatch are produced, and NMFS should have considered extending closures in these areas instead of making the Florida Closure a permanent, year-round restriction, which will effectively shut down Florida fishing communities. (*Id.* at 2–3, 15–18 (citing A.R. Vol. 45, Doc. H134, at 9–3—9–5, 7–25; Vol. 54, Docs. H567–68, H576, H580–81, H000682).)

First, A Fisherman's Best argues that NMFS violated the Magnuson–Stevens Act's international parity requirement, 16 U.S.C. § 1854(g)(1)(C), because the Florida Closure disadvantages domestic fishers in relation to their foreign competitors. (Fisherman's Best Mem. at 28–29 n. 1.) Plaintiff contends that NMFS failed to undertake an adequate evaluation of the HMS FMP's effect on Florida's fishing communities in relation to those of its foreign competitors. (*Id.*) As a result of the Florida Closure, plaintiff says, United States fishers will go out of business, and "foreign competitors will benefit because they will be able to supply the fish to U.S. markets that Florida's fishermen previously supplied." (*Id.*)

Second, A Fisherman's Best asserts that NMFS failed to obtain sufficient information about or account for the Florida fishers' "traditional fishing patterns" and the "operating requirements of the [Florida East Coast] fisheries," as 16 U.S.C. § 1854(g)(1)(G)(ii) requires. (Fisherman's Best Mem. at 27 n. 20.) Plaintiff claims that NMFS "accounted for the Florida's

day boat fleet's traditional fishing patterns only by acknowledging the obvious point that the [HMS FMP] disrupted them." (*Id.* (citing A.R. Vol. 45, Doc. H134, at 10–2).) In addition, says plaintiff, NMFS's regulations "unjustly singled out East Coast Florida pelagic longline fishermen and fish dealers to bear the full brunt of the closures thus resulting in unfair and inequitable fishing privilege allocations among U.S. fishermen" in violation of 16 U.S.C. § 1854(g)(1)(G)(iii). (*Id.* at 34 n. 22.)

Plaintiff's claims are not supported with record evidence, and its arguments fail to consider the competing National Standards' requirements. Congress, while aware of the potential conflicts among the Magnuson–Stevens Act's provisions, nevertheless "required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards .…" *Alliance Against IFQs,* 84 F.3d at 350. Again, in undertaking this balancing analysis under the Magnuson–Stevens Act, NMFS "must give priority to conservation measures." *Natural Resources Defense Council,* 209 F.3d at 753.

As is discussed above, even if the Florida Closure were considered an "allocation measure," an HMS FMP "may contain management measures that allocate fishing privileges if such measures are necessary or helpful in furthering legitimate objectives or in achieving the [optimum yield], and if the measures conform with paragraphs (c)(3)(i) through (c)(3)(iii) of this section." 50 C.F.R. § 600.325(c), (c)(3)(i)-(iii). NMFS has shown that the Florida Closure furthers a "legitimate FMP [conservation] objective" to reduce bycatch. 50 C.F.R. § 600.325(c)(3)(i)(A); *see Alliance Against IFQs,* 84 F.3d at 350 ("Controlling precedent requires that a plan not be deemed arbitrary and capricious, '[e]ven though there may be some

discriminatory impact,' if the regulations 'are tailored to solve a [fishery-related] problem and to promote the conservation of [a fish species].'") (quoting *Alaska Factory Trawler Ass'n,* 831 F.2d at 1460). Plaintiff has not shown that the Florida Closure fails to promote conservation or that the Secretary failed to evaluate the effects on participants in the affected fisheries. In addition, plaintiff has provided no concrete evidence at all—dollar value or otherwise—of the harms that Florida fishers allegedly will suffer as a result of domestic and/or foreign competition. The mere assertion that fishers in other states and foreign nations will not be as affected by the Florida Closure and will continue to fish is not enough to show that NMFS has violated the Magnuson–Stevens Act. *See Alaska Factory Trawler Ass'n,* 831 F.2d at 1464; *Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1428 (M.D.Fla. 1998) (stating that Congress did not intend the Secretary "to suspend his conservation and management obligations whenever fish stocks become lethally subject to both foreign and domestic harvest"); *National Fisheries Inst. v. Mosbacher,* 732 F.Supp. at 221 ("Merely because [certain species] are also harvested beyond [United States waters] is no reason why the Secretary should not regulate them within the bounds of his authority under the [Magnuson–Stevens] Act.").

NMFS has set forth sufficient conservation benefits from the Closure Rule, and plaintiff has not shown any specific disadvantages that they would suffer in relation to foreign or domestic competition. The challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate sections 1854(g)(1)(C), (g)(1)(G)(ii)-(iii) of the Magnuson–Stevens Act.

**2. The Regulatory Flexibility Act**

▮ A Fisherman's Best claims that the Florida Closure violates the RFA, as

amended by the SBREFA, which directs agencies to evaluate the effects that new regulations will have on small business entities. *See* 5 U.S.C. §§ 601–12. When promulgating a proposed new regulation in the Federal Register, agencies are directed to perform an Initial Regulatory Flexibility Analysis ("IRFA") discussing the new rule's impact on small entities. 5 U.S.C. § 603. In addition, when an agency promulgates a final rule, it must perform a Final Regulatory Flexibility Analysis ("FRFA"), which must contain, among other criteria,

> [A] description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(5).

The RFA's requirements "do not alter in any manner standards otherwise applicable by law to agency action." 5 U.S.C. § 606. The standard of review is the same as that under the APA, in that a court reviews the FRFA for arbitrary and capricious action. 5 U.S.C. § 611(a)(2). A reviewing court may remand a rule to the agency for failure to comply with the RFA. 5 U.S.C. § 611(a)(4)(A).[18] However, the RFA requirements cannot override the Magnuson–Stevens Act's mandate. *See* 5 U.S.C. § 606. NMFS prepared an FRFA for the HMS time/area closures, *see* A.R. Vol. 45, Doc. H134, Ch. 8, and considered "all pelagic longline permit holders" to be the relevant small entity universe, which

includes A Fisherman's Best and other sectors of the commercial fishery. *Id.* at 8–2—8–3.

A Fisherman's Best claims that NMFS violated the RFA by failing to consider and analyze the Florida Closure's economic, social and environmental effects, as well as alternatives to reduce bycatch that would minimize the harmful impacts upon Florida's fishing communities. (*Id.* at 19, 22, 43–45.) A Fisherman's Best alleges that NMFS failed to give full consideration to alternatives including partial-year, monthly (or "rolling") closures, gear restrictions and different closure locations. (*Id.* at 22–25, 44–45.) In addition, plaintiff argues, NMFS did not explain its rationale for basing its closure regulations on only swordfish bycatch information. (*Id.* at 22 (citing A.R. Vol. 45, Doc. H134, at 1–3, 7–16—7–31).) Finally, A Fisherman's Best argues that the analysis that NMFS did perform was "flawed and superficial," pointing to the proposed closure alternatives that "did not fairly consider the many potential partial closure options that could have achieved significant swordfish bycatch reductions." (*Id.* at 44.)

As is discussed above, NMFS considered alternatives, including a "no action" or "status quo" alternative, to determine which combination of regulations would best achieve the agency's conservation goals, minimize the economic impact on fishing communities and fulfill its obligations under the Magnuson–Stevens Act and the RFA. *See* A.R. Vol. 45, Doc. H134, at 7–3—7–31, 7–53, 7–59, Ch. 8 & App. B–7. NMFS considered part-year closure alternatives. A.R. Vol. 45, Doc. H134, at 7–21—7–22. (*See* Environmental Intervenors' Reply at 7–8.) In addition, NMFS rejected the western Gulf of Mexico pro-

---

**18.** The RFA provides for judicial review of an agency's compliance with the FRFA requirements but not of an agency's compliance with the IRFA requirements. *See* 5 U.S.C. §§ 611(a)(1), (2); *Allied Local & Regional Mfrs. Caucus,* 215 F.3d at 78–79.

posed closure, delayed the effective dates of the Florida Closure and the Charleston Bump closure, and rejected an extension of the Charleston Bump closure to minimize negative economic impacts on fishers and dealers. (Defs.' Mem. at 53.) *See* 66 Fed. Reg. 22,994.

Contrary to plaintiff's assertion, nothing in the record shows that NMFS's analyses were "flawed" or "superficial." Unlike cases in which the agency failed to satisfy the RFA's requirements, here the NMFS prepared an IRFA to precede its FRFA, *see* A.R. Vol. 43, Doc. H44, and there is no evidence that NMFS consciously ignored its own data or selected a flawed methodology for analyzing bycatch. *Cf. North Carolina Fisheries Ass'n v. Daley,* 27 F.Supp.2d 650, 659–60 (E.D.Va.1998) (holding that the NMFS's economic analysis did not satisfy the RFA because it "consciously ignored [its] own data and selected a flawed methodology" to analyze the flounder fishery); *Southern Offshore Fishing Ass'n,* 995 F.Supp. at 1434–37 (holding that the Secretary's fishery management plan violated the RFA, because NMFS failed to prepare an IRFA as § 603 requires and thus "could not possibly have complied with § 604 by summarizing and considering comments on an IRFA that NMFS never prepared").

■■■■ "The RFA does not command an agency to take specific substantive measures, but rather, only to give explicit consideration to less onerous options." *A.M.L. Int'l, Inc.,* 107 F.Supp.2d at 105 (citing *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 114 (1st Cir.1997)). Despite plaintiff's suggested alternatives (*see* Fisherman's Best Mem. at 44–45), the RFA does not give plaintiff the authority to determine which alternative best meets the agency's goals. The Administrative Record, including the FRFA, shows that NMFS gave explicit consideration to closure alternatives that were less onerous *and* more onerous than the final Closure Rule. *See* A.R. Vol. 45, Doc. H134, at 7–3— 7–31, 7–53, 7–59, Ch. 8 & App. B–7. Accordingly, the challenged provisions of the HMS FMP, including the August 1, 2000 Closure Rule, do not violate the RFA.

## IV. CONCLUSION

Conservation objectives have priority over other Magnuson–Stevens Act objectives, such as minimizing adverse economic impacts. *See Natural Resources Defense Council,* 209 F.3d at 753. Based on the evidence in the Administrative Record, the federal defendants were not arbitrary or capricious in promulgating the HMS FMP, including the August 1, 2001 Closure Rule.[19] The challenged provisions of the HMS FMP do not violate the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(1), (2), (4), (7)-(10), 1853(a)(10)-(11), 1854(e)(3), 1854(g)(1)(C), (g)(1)(G)(ii)-(iii), the RFA, 5 U.S.C. §§ 601–12, or the APA, 5 U.S.C. §§ 706(2)(A), (C). Accordingly, the federal defendants' cross-motion for summary judgment will be granted and plaintiffs' motions for summary judgment will be

**19.** Defendants would be wise in promulgating future closure measures, though, to be cognizant that the Magnuson–Stevens Act "should not be used as a buzzsaw to mow down whole fishing communities in order to save some fish." *North Carolina Fisheries Ass'n,* 27 F.Supp.2d at 667. Rather, there are workable compromises within these extremes. Environmental groups, fisher associations and NMFS must take a hard look at these very important conservation and economic concerns to arrive at viable solutions for all concerned parties. As the Secretary has recognized here, and as the Secretary should recognize for future challenges to fishery management plans, it is in the public's best interest to protect and rebuild the fish species *and* the fishing communities' livelihood.

**144**

denied. The motion for summary judgment by intervenor-defendants Blue Water Fishermen's Association, *et al.* in Civil Actions 99–1692 and 00–2086 will be denied as moot, and the motion for summary judgment by intervenor-defendants National Coalition, *et al.*, in Civil Action 00–3096 will be denied as moot. Finally, the federal defendants' Motion to Strike Exhibits B, F and H of A Fisherman's Best's cross-motion for summary judgment will be denied as moot. A Final Order accompanies this Memorandum Opinion.