**HADAJA, INC., Plaintiff,**

v.

**Donald EVANS, In his official capacity as United States Secretary of Commerce, Defendant.**

**No. C.A. 01–517S.**

United States District Court,
D. Rhode Island.

May 15, 2003.

Richard Leo Walsh, III, North Kingstown, RI, for Plaintiff.

Michael P. Iannotti, U.S. Attorney Office, Providence, RI, S. Jay Govindan, U.S. Dept. of Justice, Washington, DC, for Defendant.

### DECISION AND ORDER

SMITH, District Judge.

On October 26, 2001, Plaintiff Hadaja, Inc. ("Hadaja" or "Plaintiff") initiated this action seeking judicial review of rules promulgated by the Defendant regarding the "Tilefish Fishery Management Plan" ("TFMP").[1] Hadaja moved for summary

---

1. This Court has jurisdiction to review these rules pursuant to 16 U.S.C. § 1855(f), 5

judgment on November 26, 2002. In essence, Hadaja argues that certain regulations put in force as a result of the adoption of the TFMP violate mandates of the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* Defendant cross-moved for summary judgment on December 10, 2002, claiming that the TFMP regulations at issue were properly enacted in an effort to conserve the suffering tilefish population. On March 21, 2003, this Court heard oral argument on the parties' motions. After considering the parties' oral arguments, their briefs, and navigating the voluminous administrative record (the "Record"), this Court grants the Plaintiff's Motion for Summary Judgment in part and denies it in part. Similarly, the Defendant's Motion for Summary Judgment is granted in part and denied in part.

*Factual Background*

The tilefish, *Lopholatilus chameleonticeps,* and commonly known as the "Clown of the Sea," is one of the most colorful fishes in North American waters with a body that is blue-green, yellow, rose, silver with golden spots and a yellow mask around the eyes. It inhabits the outer continental shelf from Nova Scotia to South America, and is relatively abundant in the Southern New England to Mid–Atlantic area at depths of 80 to 440 meters. It is generally found in and around submarine canyons where it occupies burrows along the ocean floor.

While tilefish have been fished since the late 1800s, the frequency of tilefish landings has decreased over the past fifty years. On June 15, 1993, the National Marine Fisheries Service ("NMFS") established a control date for entry into the tilefish fishery, which meant that commercial vessels after that date "would not be assured of future access to or an allocation of the tilefish resource if a management regime [was] developed and implemented." Record at 2028. In 1998, the NMFS determined that the tilefish fishery was overfished.[2]

A. *The Background of the Magnuson–Stevens Act*

Congress enacted the Magnuson–Stevens Fishery Conservation and Management Act (the "Act") in order to respond to overfishing and inadequate conservation measures that were "threatening future commercial and recreational fishing, as well as the very survival of the species." *Hall v. Evans,* 165 F.Supp.2d 114, 123 (D.R.I.2001) (quoting *Parravano v. Babbitt,* 837 F.Supp. 1034, 1040 (N.D.Cal. 1993)). In order to render the management process provided in the Act more efficient, Congress created a number of different regional fishery management councils composed of state fisheries officials, the NMFS administrator, and other qualified representatives from the academic, recreational, and environmental communities. Each council controls the fisheries in the states over which it has control, and its primary responsibility is to develop management plans that establish the rules for each fishery as ordered by the Act. *See* 16 U.S.C. § 1854(e)(2); 50 C.F.R. § 600.310(e)(2). In this case, the

U.S.C. § 611, and 5 U.S.C. § 701 *et seq.*

**2.** "The terms 'overfishing' and 'overfished' mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29).

Maximum sustainable yield is in turn defined as the "largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(2002).

relevant council is the Mid–Atlantic Fishery Management Council (the "Council").

When the Secretary of Commerce determines that a fishery has been overfished, the Secretary informs the appropriate council, which in turn has one year to prepare a fishery management plan ("FMP") that will rebuild the stocks of fish and end overfishing. *See* 16 U.S.C. § 1854(e)(3); 50 C.F.R. § 600.310(e)(3). After a council submits an FMP to the Secretary of Commerce, the Secretary (usually acting through the NMFS) must review the FMP and ensure that it complies with federal law and the relevant provisions of the Act. *See* 16 U.S.C. § 1851(a)(1–10), § 1854(a)(1); 50 C.F.R. §§ 600.310–600.355. The Secretary must also allow public comment on the FMP over a period of sixty days following its submission. *See* 16 U.S.C. § 1854(a)(1)(B).

The FMPs may include a system to limit access to any fishery in order to achieve optimum yield if the council and the NMFS take certain factors into account. These factors are: (a) present participation in the fishery; (b) historical fishing practices in, and dependence on, the fishery; (c) the economics of the fishery; (d) the capability of fishing vessels used in the fishery to engage in other fisheries; (e) the cultural and social framework relevant to the fishery and any affected fishing communities; and (f) any other relevant considerations. *See* 16 U.S.C. § 1853(b)(6). The FMPs are then promulgated by the Secretary through the NMFS as regulations published in the Federal Register. 16 U.S.C. § 1854(b)(1)(A). *See also Massachusetts v. Daley*, 170 F.3d 23, 27–28 (1st Cir.1999). The final implementing regulations, once promulgated by the Secretary, have the full force and effect of law. *See* 16 U.S.C. §§ 1854, 1855.

Importantly, the regulations must be consistent with ten "National Standards" for fishery conservation and management set out in Section 301 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a). In this case, Hadaja alleges violations of three of the National Standards: Standard One, 16 U.S.C. § 1851(a)(1), which requires conservation and management measures to prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery; Standard Two, 16 U.S.C. § 1851(a)(2), which requires that conservation and management measures be based on the "best scientific information available;" and Standard Four, 16 U.S.C. § 1851(a)(4), which prohibits conservation and management measures from discriminating between residents of different states.

## B. *The TFMP*

### 1. *Limited Access*

After determining that the tilefish fishery was overfished, the Council assessed the stock of tilefish in the Middle Atlantic–Southern New England region and created a Tilefish Committee (the "Committee") to make recommendations. The Committee determined that a limited access scheme was appropriate for dealing with the tilefish fishery. A limited access scheme restricts the number of vessels allowed to fish in a particular fishery with the goal of ending overfishing and rebuilding the fish population. Record at 2028. Public hearings were held in Rhode Island, New York, and New Jersey during August of 1999. Record at 1390–93; 1409–14; 1423–27. Hadaja did not attend any of these hearings.

The Council has the authority to enact permitting restrictions pursuant to 50 C.F.R. § 648.293. At the direction of the Council, the Committee contemplated five limited access schemes, with the preferred scheme providing for various full-time and

part-time access permits. Record at 2222. Under the preferred scheme, the majority of the full-time permit holders were located in Montauk, New York. Record at 2437. The majority of part-time vessels were located in Rhode Island and New Jersey. *Id.* However, the Historic Tilefish Coalition and the Montauk Tilefish Association, industry groups from New Jersey and New York, did not agree with this proposal because they felt the preferred scheme did not adequately represent their memberships. In response to the objections, the Committee urged the industry groups to reach a compromise regarding the limited entry option for later inclusion in the FMP. *Id.*

As a compromise, the industry groups split the full-time permit category into two tiers of four vessels each. The four vessels that qualified for the first tier are from Montauk, New York. Record at 2437. The second tier is composed of boats from New York and New Jersey. The compromise also provided for a part-time category, which would consist of forty-two vessels, eleven of which would be able to pre-qualify for a part-time permit based upon their historical participation [3] in the tilefish fishery.

The compromise also provided that incidental permits would be available to all other vessels that do not qualify for full-time or part-time permits. An incidental permit would allow a vessel to obtain up to 300 pounds of tilefish per trip regardless of a vessel's historical participation in the tilefish fishery. *See* 50 C.F.R. § 648.292. Importantly, however, vessels that would not qualify for full-time or part-time permits under the compromise would not receive priority to fish in the tilefish fishery once the fishery had been sufficiently rebuilt. Record at 2029–30, 2437. It is this provision with which Hadaja is most concerned. Because Hadaja only is eligible for an incidental permit under the compromise plan, it would be unable to fully participate in the tilefish fishery in the event it is rebuilt.

In other words, Hadaja has been relegated to perenial secondary status once the fishery is rebuilt, because he does not qualify for part-time status now. Other vessels, blessed by this plan with "part-time" permits will stand to ramp-up to full-time status when the fishing is rebuilt, leaving Hadaja and others in their wake.

## 2. Trawling

In addition to creating the permit-based limited access scheme, the Committee evaluated the use of different types of fishing gear on the tilefish population. Based on available studies, the Committee determined that trawling was having a long-term, negative impact on the tilefish population. Record at 1903. While trawling represented a low percentage of the total tilefish landings, the Committee concluded that trawling contributed to a high rate of tilefish mortality. Additionally, the Committee inferred that trawling had a negative impact on tilefish burrows due to the trawl gear's contact with sediment that tilefish use as burrows. As a result, the Committee determined that limiting the use of trawl gear was an effective means of halting the decline of tilefish, and therefore provided that any vessel issued a limited access tilefish permit could not fish for tilefish with gear other than longline gear, or possess gear other than longline gear. *See* 50 C.F.R. § 648.294.

The Council adopted the recommendations of the Committee with respect to the limited access scheme and trawl gear re-

---

**3.** Historical participation involves a vessel's history of fishing for a particular fish in light of the vessel's economic dependence on fishing for that species of fish.

strictions. These recommendations were then published in the Federal Register pursuant to 16 U.S.C. § 1854(b)(1)(A).

### C. Hadaja's Complaint[4]

While it is unclear from the face of the Complaint, subsequently filed memoranda indicate that Count I alleges that the limited access scheme and the trawl gear restrictions violate National Standard Two, in that they were not based on the best scientific evidence available. *See* 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315. Count II of Hadaja's Complaint alleges that the TFMP's limited access scheme violates National Standard One because the compromise proposal fails to prevent overfishing. *See* 16 U.S.C. § 1851(a)(1); 50 C.F.R. § 600.310. Also unclear from the face of the Complaint, Hadaja appears to allege in Count III that the limited access scheme and trawl gear restrictions violate National Standard Four because they unfairly favor vessels from New York and New Jersey to the disadvantage of Rhode Island vessels. *See* 16 U.S.C. § 1851(a)(4).

### Analysis

### A. Standard of Review

District courts review agency actions, such as FMPs, under the Act pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, 16 U.S.C. § 1855(f)(1). The agency decision shall be set aside only if the actions of the agency are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A regulation will be held to be arbitrary or capricious when,

> the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hall,* 165 F.Supp.2d at 127–28 (D.R.I.2001) (citing *Connecticut v. Daley,* 53 F.Supp.2d 147, 157 (D.Conn.1999)).

Under the APA, administrative actions are to be presumed valid and afforded great deference. Accordingly, even at the summary judgment stage, judicial review is circumscribed. *See id.* Under the "arbitrary and capricious" standard, the court must determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *See Penobscot Air Services, Ltd. v. Federal Aviation Admin.,* 164 F.3d 713, 719 (1st Cir.1999). Yet despite this deferential standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962)). Thus, the agency must "explain its result . . . and respond to relevant and significant public comments." *Penobscot,* 164 F.3d at 719, n. 3 (citations omitted).

Summary judgment is warranted when "the pleadings, depositions, answers to in-

---

4. Hadaja's Complaint makes blanket references to the Plan's "permit standards" without differentiating between the limited access scheme and the gear restrictions. However, both the Plaintiff's and Defendant's memoranda in support, and in opposition, to the motions for summary judgment indicate that the Complaint's references to "permit standards" include both the limited access scheme and the gear restrictions.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

This case involves the parties' cross-motions for summary judgment. However, "[c]ross motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int. Group, Inc. v. Ferre Development, Inc.*, 241 F.3d 103, 107 (1st Cir.2001) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996)). Cross motions for summary judgment are particularly appropriate for resolving administrative appeals when no new evidence is being presented. *See Bristol Warren Regional School Comm. v. R.I. Dept. of Education*, C.A. 02–349S, 2003 WL 1584651, *3 (March 18, 2003 D.R.I.).

B. *The TFMP's Limited Access Scheme*

The limited access scheme set forth in the TFMP, in pertinent part, is as follows:

**Vessel permits.**

(a) . . . .

(12) Tilefish vessels. Any vessel of the United States must have been issued and carry on board a valid tilefish vessel permit to fish for, possess, or land tilefish in or from the tilefish management unit.

(i) Limited access tilefish permits—(A) Eligibility. A vessel may be issued a limited access tilefish permit if it meets any of the following limited access tilefish permit criteria, provided that the vessel landed the specified amounts of tilefish to meet such criteria within the tilefish management unit:

(1) Full-time tier 1 category. The vessel landed at least 250,000 lb (113,-430 kg) of tilefish per year for any 3 years between 1993 and 1998, at least 1 lb (2.20 kg) of which was landed prior to June 15, 1993.

(2) Full-time tier 2 category. The vessel landed at least 30,000 lb (13,612 kg) per year for any of 3 years between 1993 and 1998, at least 1 lb (2.20 kg) of which was landed prior to June 15, 1993.

(3) Part-time category. The vessel landed 10,000 lb (4,537 kg) of tilefish in any 1 year between 1988 and 1993 and 10,000 lb (4,537 kg) in any 1 year between 1994 and 1998, or landed 28,-000 lb (12,904 kg) of tilefish in any 1 year between 1984 and 1993, at least 1 lb (2.20 kg) of which was landed prior to June 15, 1993.

50 C.F.R. § 648.4(a)(12)(i). *See* Record at 2533. Hadaja argues that parts of this limited access scheme violate a number of the Act's National Standards.

1. *National Standard One*

National Standard One provides the following:

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

16 U.S.C. § 1851(a)(1). Optimum yield is the amount of fish that provides for rebuilding to a level consistent with producing the maximum sustainable yield. *See* 16 U.S.C. § 1802(28)(C); 50 C.F.R.

§ 600.10. *See also A.M.L. Int., Inc. v. Daley*, 107 F.Supp.2d 90, 101 (D.Mass.2000).

■ With the exception of its initial pleading in the Complaint and a cursory reference in its reply memorandum, the Plaintiff does not address the limited access scheme's compliance with National Standard One. The Defendant, however, argues that the TFMP was developed taking into account the factors listed in 16 U.S.C. § 1853(b)(6) in order to achieve an optimum yield for the tilefish fishery. *See* Record at 1957–58 (evaluating present and historic participation); Record at 1961–2018 (considering social framework and affected fishing communities). The Plaintiff offers nothing to rebut this argument. This Court, particularly in light of the narrow standard of review in this case, will not cast about blindly for such a basis. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: 'Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.' ") (citing *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) (quoting *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.1988))). The TFMP's limited access scheme does not violate National Standard One. Therefore, summary judgment is appropriate in favor of the Defendant as to this Count.

### 2. National Standard Two

National Standard Two provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Under the agency's national standard guidelines, the Secretary must base his determinations upon information available at the time of the preparation of the FMP or implementing regulations. *See* 50 C.F.R. § 600.315(b)(2).

Hadaja argues that the Defendant violated National Standard Two with respect to the part-time permits because it failed to base the limitations on any available scientific information. Rather, it accepted the limits based on an industry group "hallway compromise" submitted by the New York and New Jersey vessel owners. Specifically, the Plaintiff takes issue with the qualifying time periods and weight thresholds needed to obtain a part-time permit. The TFMP allows for landings of over 28,000 lbs. made between 1984–1993 to be sufficient to qualify a vessel for a part-time permit. Prior to consideration of the industry compromise, the Committee was prepared to use 1988 as the cutoff date, as opposed to 1984. Hadaja asserts that the only reason that these limitations were selected by the Committee is because they represented a compromise acceptable to the New York and New Jersey contingents. Therefore, the limitations were not based on the best scientific information available (or any scientific basis, for that matter).

■ While National Standard Two does not compel the use of specific analytic methods or require that an agency gather all possible scientific data before acting, the Standard does prohibit an agency from simply creating a rule based on mere political compromise. *See Hall*, 165 F.Supp.2d at 133; *The Fishing Company of Alaska v. United States*, 195 F.Supp.2d 1239, 1248 (W.D.Wash.2002); *Parravano v. Babbitt*, 837 F.Supp. 1034, 1047 (N.D.Cal.1993). *See also Midwater Trawlers Co–operative v. Dept. of Commerce*, 282 F.3d 710, 720–21 (9th Cir.2002) ("A plain reading of the

proposed NMFS rule ... demonstrate[s] that the rule was a product of pure political compromise, not reasoned scientific endeavor. Although the NMFS allocation may well be eminently fair, the Act requires that it be founded on science and law, not pure diplomacy."). "[A] regulation must be based on concrete analysis that permits the Secretary to 'rationally conclude that his approach would accomplish his legitimate objectives.'" *The Fishing Company of Alaska,* 195 F.Supp.2d at 1248 (quoting *Parravano,* 837 F.Supp. at 1047).

In response, the Defendant contends that the limited access scheme was based on the best scientific evidence available because after receiving the compromise in 1999, the Committee compiled and analyzed fifteen years worth of tilefish data. *See* Defendant's Memorandum of Law in Opposition to Motion for Summary Judgment ("Defendant's Memorandum") at 15. This data, the Defendant contends, is contained in Table 79 of the Record. Record at 2220–21. The Secretary also argues that the he did not approve the compromise at that time, but instead waited to make a final decision on the rules until 2001 after he had the entire record in front of him and could analyze the relevant data. *See id.;* Record at 2039.

■ The TFMP candidly acknowledges that the limited access scheme was adopted directly from the compromise reached between the New York and New Jersey industry groups.[5] However, despite the Defendant's argument that the compromise was only adopted after considering additional scientific evidence, that conclusion is not evident in the record. While Table 79 indicates the historical participation in the tilefish fishery from 1984 through 1998, merely stating in conclusory fashion that the compromise was considered in light of scientific evidence does not bring the TFMP within the requirements of National Standard Two. *See Hall,* 165 F.Supp.2d at 133; *Parravano,* 837 F.Supp. at 1047. Conclusory statements regarding the consideration of scientific data are not sufficient—the FMP must inform its audience of the actual scientific basis supporting it.

Therefore, this Court holds that the TFMP's limited access scheme is not based on scientific evidence, but born of a political compromise between two powerful industry groups. It is clearly arbitrary and should be set aside. The Secretary must adopt a plan that is based upon the best available scientific evidence. That may well be the same plan that was adopted—but only if the record evidence clearly supports it.

### 3. *National Standard Four*

National Standard Four provides as follows:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individu-

---

5. The TFMP states as follows:

 Representatives of the two major factions of tilefish fishermen, the Historic Tilefish Coalition ... and the Montauk Tilefish Association ... met, discussed often, and worked very hard to develop a compromise that best represented their memberships. They presented the compromise position to the Council at the 23 November Council meeting and the Council adopted their position. Record at 2029.

al, corporation, or other entity acquires an excessive share of such privileges. 16 U.S.C. § 1851(a)(4). In interpreting National Standard Four, courts have held that regulations that result in minor discriminatory impact do not automatically violate National Standard Four. *See Alaska Factory Trawler Assoc. v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir.1987); *Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1577 n. 7 (S.D.Fla.1994) (finding that any discriminatory impact between fishermen of different states is outweighed by the overall benefits to the fishery and the environment); *F/V Robert Michael, Inc. v. Kantor,* 961 F.Supp. 11, 15 (D.Me.1997).

██ Hadaja argues that the TFMP violates National Standard Four because the tilefish fishermen who were granted full-time and part-time status under the limited access scheme are from New York and New Jersey, while New England fishermen did not qualify for these permits. However, the Record indicates in detail the fishermen who were excluded from receiving a part-time tilefish permit. Record at 2111. Fishermen from Rhode Island were among the largest group excluded, but they were not the only group. The Record makes clear that numerous fishermen from Hampton Bay, New York and Montauk, New York were also denied permits under the scheme. *See id.* The scheme provided permits based on the fishermen's current reliance on the tilefish fishery. It is only logical that if most of the fishermen who currently rely on the tilefish fishery are from New York and New Jersey, they will be the ones who receive the full-time permits. If Rhode Island fishermen do not rely on the fishery they cannot expect to receive full-time permits. While there may be some adverse impact on Rhode Island fishermen as a result, the Record reveals no evidence that the Committee specifically sought to exclude Rhode Island fishermen to the advantage of New York or New Jersey fishermen. This result merely stems from the Committee's belief that such a scheme would benefit the overall fishery ·to the (unfortunate) detriment of certain· fishermen, including those from Rhode Island. With respect to National Standard Four, such an interest-weighing approach is neither arbitrary, nor capricious, nor contrary to law. *See Alliance Against IFQs v. Brown,* 84 F.3d 343, 349 (9th Cir.1996) (holding that the Secretary is allowed to sacrifice the interests of some fishermen to benefit the interests of the fishery as a whole); *Hall,* 165 F.Supp.2d at 142 ("The Secretary is permitted to sacrifice the interests of a group of fishermen under ... National Standard Four, if in so doing he ameliorates the depleted state of monkfish."). Therefore, this Court concludes that the TFMP's limited access scheme does not violate National Standard Four.

### C. *The TFMP's Prohibition Against Trawling*

The TFMP's restriction on the use of trawl gear[6] provides that "[a] vessel issued a limited access tilefish permit issued under § 648.4(a)(12)(i) cannot fish for tilefish with any gear other than longline, or possess gear other than longline gear unless properly stowed in accordance with § 648.23." 50 C.F.R. § 648.294. Hadaja argues that the TFMP's restriction on the use of trawl gear also violates National Standards Two and Four.

---

**6.** Trawling involves fishing with "a large conical net with a device for keeping its mouth open that is dragged along the sea bottom in gathering fish or other marine life." Webster's Third New International Dictionary 2433 (2002).

### 1. *National Standard Two*

The Defendant contends that the TFMP's restriction on the use of trawl gear in the tilefish fishery is proper for two reasons: (1) trawling in the tilefish fishery should be prohibited because it has a negative effect on the tilefish habitat, and (2) trawling results in an increased level of fish mortality due to excessive "bycatch." [7] Record at 2028. Hadaja claims that these conclusions violate National Standard Two because they are not supported by scientific evidence contained in the Record.

■ Despite the Defendant's arguments to the contrary, a review of the Record indicates that the Committee lacked the necessary scientific data to determine that trawl gear has a negative impact on the tilefish habitat. The following excerpt from the TFMP is instructive in this regard.

> During the public hearing process, the Council received significant input from both the directed tilefish fishing industry and other fishing industry representatives that bottom-tending mobile gear was not significantly having an identifiable adverse effect on tilefish EFH. The environmental community strongly supported the association that bottom tending mobile gear can destroy bottom structures and that since tilefish are significantly dependent on bottom structure for their burrows, bottom tending mobile gear should be banned in tilefish HAPC.
>
> On 30 September 1999, the Tilefish Technical Team consisting of Council staff, a Council member, NMFS (both NERO and NEFSC) personnel, academics and industry representatives

were hosted in a workshop ... to discuss the impacts of fishing gear to tilefish habitat. It was concluded that there is nothing definitively known about tilefish-mobile fishing gear interactions....
*Any short-term or long-term impacts of bottom tending mobile gear specifically to tilefish habitat are unquantifiable at this time. The scientists ... concluded that a research program to answer these questions was the appropriate approach to take.... The scientific research program will be developed within the near term.*

Record at 1903 (emphasis added). As illustrated by the above passage, the TFMP itself indicates that the Committee needed further scientific information before it could determine whether trawling has a negative impact on the tilefish fishery. Despite this conclusion, the Committee determined that the use of trawl gear should be prohibited in the tilefish fishery. This conclusion, however, while appealing from a common-sense point of view, is not based on scientific evidence.

The Defendant argues that habitat protection was not the only basis for the Defendant's implementation of the restriction on trawl gear. The Defendant asserts that the TFMP's gear restriction was also implemented as part of a broader effort to decrease tilefish mortality. In support of this argument, the Defendant refers the Court to testimony from the Tilefish Industry Advisory Subcommittee regarding reasons for the gear restriction.

> There are tremendous advantages in having a longline fishery. I wish we had our otter trawl individual here today, ... I wish we had representation at this Committee of the Rhode Island otter trawl fishermen. They take very small

---

**7.** Bycatch means fish that are harvested in a fishery, but which are not sold or kept for personal use. The term includes economic and regulatory discards. *See* 16 U.S.C. § 1802(2).

fish ... 1 lb to 2 lbs ... they take them in January, February and March, often in association with summer flounder fisheries, but often it is targeted. The price per lb of those fish is 1/3 the price per pound of what the longline fishermen get. They could be contributing as much mortality potentially as the longline fishery, because there are significant discards from what we understand, *but we don't have any sea sampling data to quantify it. There is a concept that I am thinking that maybe the otter trawl fishery that is directed for summer flounder should be an experimental fishery, and we should be mandating that an at-sea observer be onboard that, to get discard information, to get the length frequency of the catch, because they can be contributing a tremendous amount to fishing mortality.*

Record at 158 (emphasis added). The Defendant's reference to this testimony in support of its argument that the gear restriction is supported by the best scientific evidence available is perplexing. This language implies the exact opposite conclusion of that asserted by the Defendant. The Committee had no data to quantify trawling's impact on the tilefish fishery, and the Committee recommended that observers should be placed on board fishing vessels to make determinations regarding tilefish mortality. *See id.* Such a lack of information demonstrates even more clearly that the Committee had no scientific evidence on which to base its conclusions. It is true that an FMP only needs to rely on the *best* information *available* when implementing its rules. *See* 50 C.F.R. § 600.315(b) ("fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP"); *Nat'l Coalition for Marine Conservation v. Evans,* 231 F.Supp.2d 119, 130 (D.D.C.2002); *Massachusetts v. Daley,* 170 F.3d at 30 (regula-

tions can be enacted despite lack of complete information). However, there is a difference between relying on conflicting evidence or incomplete evidence and relying on no evidence. This is not a case of conflicting or incomplete evidence where the Committee has determined what is the best available evidence from among conflicting sources. Here, the evidence that the Defendant put forth in support of the gear restriction actually establishes that the Committee did not have *any* evidence to support a restriction on trawl gear.

Therefore, the TFMP's restriction on the use of trawl gear violates National Standard Two and shall be set aside.

### 2. National Standard Four

■ Hadaja also appears to allege in the Complaint that the TFMP's restriction on the use of trawl gear discriminates between residents of different states in violation of National Standard Four. *See* Complaint at ¶¶ 11–12. However, Hadaja has not addressed this allegation since it was raised in the Complaint. Upon reviewing the TFMP's restriction on the use of trawl gear in light of the requirements of National Standard Four, it is clear to this Court that the restriction is applied even-handedly and does not discriminate against fishing vessels based on their locality or homeport. Therefore, this Court finds that the TFMP's restriction on the use of trawl gear does not violate National Standard Four.

### Conclusion

For the reasons stated above, the Plaintiff's Motion for Summary Judgment is GRANTED with respect to Count I, and DENIED with respect to Counts II and III. Accordingly, the Defendant's Motion for Summary Judgment is GRANTED with respect to Counts II and III, and DENIED with respect to Count I. This

Court further orders that the regulations 50 C.F.R. § 648.4(a)(12) and 50 C.F.R. § 648.294 shall be set aside pending further proceedings, based on the regulations' failure to comport with National Standard Two of the Magnuson–Stevens Fishery Conservation and Management Act.

IT IS SO ORDERED.